BEYS, STEIN & MOBARGHA LLP

Michael P. Beys
646.755.3605 (Direct)
mbeys@beysstein.com

October 5, 2012

**TO BE FILED UNDER SEAL**

**BY FACIMILE (718) 613-2236 AND BY MAIL**

The Honorable Brian M. Cogan
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     98 CR 1101 (ILG), 12 MC 557 (BMC)
>          Doe's Ability to Speak to the Media

Dear Judge Cogan:

We respectfully submit this letter on behalf of John Doe ("Doe"), regarding Doe's ability to speak to the media and defend himself from the barrage of bad press about him that has resulted from Richard Roe ("Roe") and Richard Lerner's ("Lerner") illegal disclosure campaign to the media.

Throughout their campaign, Roe and Lerner have revealed sealed information; exposed sealed proceedings; given "new life" to Doe's criminal history and the dangerous circumstances surrounding it; smeared his reputation, knowing that he cannot rehabilitate it by revealing the details of his patriotic service on national security matters; and garishly posed for photographs as First Amendment champions. However, this campaign has been about anything but the First Amendment: First Amendment champions do not disseminate sealed information without a court order allowing them to do so, and they to not place a man and his family's life in danger to serve their extortion in a separate, meritless litigation.

Until now, Doe and his counsel have had virtually no contact with the media – except to decline to comment, and once to ask a reporter to remove his photograph from an article.[1] Now, however, it is no longer fair for Doe to remain silent. To date, Doe's

---

[1]      In September, Doe spoke to Michael Sallah of *The Miami Herald*, who had previously published Doe's photograph on numerous occasions in the newspaper's print edition, and

October 5, 2012

silence has paved the way for Roe and Lerner to seize the narrative and tell their dishonest and warped version of events. Some reporters have drawn an adverse inference from Doe's decision not to comment, while others believe that Roe and Lerner's extortion-driven half-truths have merit due to Doe's refusal to rebut them. Either way, they have been deprived of the true version of events. In addition to being unfair, absolute silence is no longer necessary as the docket sheet for Doe's criminal case, 98 CR 1101 (ILG), has been unsealed in a manner revealing Doe's identity and the fact of his cooperation. In short, it is no longer fair or necessary for Doe to remain absolutely silent.

Against the backdrop, Doe intends to begin speaking with the media, but will do so in a way that still complies with the Court of Appeals' injunction. He will obviously not reveal the content of his sealed documents, or the documents themselves, as details of those documents may exacerbate any danger to Doe and his family. But Doe should be free to reveal that Roe stole his sealed documents from his former client in order to extort Doe, his former business, and the business's law firms, including Nixon Peabody, Duval & Stachenfeld, LLP and Roberts & Holland, LLP. He should be free to reveal that Roe demanded $105,000,000 in order to not "go viral" with Doe's sealed documents. He should be free to reveal that Roe and Lerner knew Doe's documents were sealed, privileged, confidential and involved matters of national security. He should be free to discuss Lerner and Wilson Elser's direct participation in Roe's criminal acts, their embarrassing failure to conduct due diligence of Roe – which would have revealed his pattern of extortion and racketeering toward his former clients – and the firm's even more embarrassing inability to extricate themselves from a colossal mess largely of their own making. An explanation of these events or circumstances will not violate the Court of Appeals' injunction since sealed information is not being disseminated; rather it serves to set the record straight and expose the conduct and motives of Roe, Lerner, and Wilson Elser over the past two and half years.

Fair play dictates that Doe be able to do this.

Respectfully Submitted,

Michael P. Beys
Beys, Stein & Mobargha LLP
*Counsel for John Doe*

---

continuously in the online edition. Doe spoke to Sallah and persuaded him to remove his photograph. During this conversation, Sallah told Doe that he had had conversations with Roe, in which Roe provided information about Doe's case. This, however, should come as no surprise to the Court.

2

October 5, 2012

cc:   The Honorable I. Leo Glasser

   Coleen Middleton
   *Counsel for Richard Lerner*

   Richard Roe

   Stephen Green, Asst. U.S. Attorney, N.D.N.Y.

   Todd Kaminsky, Asst. U.S. Attorney, E.D.N.Y.
   Evan Norris, Asst. U.S. Attorney, E.D.N.Y.
   Elizabeth Kramer, Asst. U.S. Attorney, E.D.N.Y.

LAW OFFICES

# LAZZARO LAW FIRM, P.C.

360 COURT STREET
SUITE 3
BROOKLYN, NEW YORK 11231

TELEPHONE: (718) 488-1900
TELECOPIER: (718) 488-1927
EMAIL: LAZZAROLAW@AOL.COM

LANCE LAZZARO
RANDALL LAZZARO *

JAMES KILDUFF *
JAMES KIRSHNER
ROGER GREENBERG

\* ADMITTED IN NY & NJ

| | |
|---|---|
| DATE: | OCTOBER 5, 2012 |
| TO: | HON. BRIAN COGAN |
| FIRM NAME: | U.S. DISTRICT COURT, EASTERN DISTRICT OF N.Y. |
| FAX NUMBER: | (718) 613 – 2236 |

| | |
|---|---|
| FROM: | JAMES KIRSHNER |
| RE: | <u>UNITED STATES v. DUCKENS PIERRE, DKT # 05-CR-791</u> |
| | <u>LETTER REQUESTING ADJOURNMENT OF SENTENCE</u> |

# OF PAGES (INCLUDING THIS ONE): __2__

TRANSMITTED BY: __J.K.__ AT __2:30 P.M.__

\*\*\* If you have any questions regarding this transmittal,
please dial (718) 488 – 1900 and speak to __Jamie__

COMMENTS:

## LAW OFFICES
# LAZZARO LAW FIRM, P.C.

360 COURT STREET
SUITE 3
BROOKLYN, NEW YORK 11231

TELEPHONE: (718) 488-1900
TELECOPIER: (718) 488-1927
EMAIL: LAZZAROLAW@AOL.COM

LANCE LAZZARO
RANDALL LAZZARO *

* ADMITTED IN NY & NJ

JAMES KILDUFF *
JAMES KIRSHNER
ROGER GREENBERG

October 5, 2012

**VIA FAX: (718) 613 – 2236**

Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     **United States v. Duckens Pierre**
        **Docket No.: 05–CR–791**

Dear Judge Cogan:

As you are aware, I represent Duckens Pierre with regard to the above-referenced matter. Mr. Pierre is currently scheduled to be sentenced before your Honor on Tuesday, October 9, 2012 at 9:30 a.m. I am writing to confirm an adjournment of his sentence to November 1, 2012 at 4:30 p.m. I requested the adjournment to allow additional time to prepare a sentencing memorandum for the Court. I have spoken to AUSA Michael Warren regarding my request, and he has no objection to the adjournment.

Thank you for your attention herein. If you have any questions, please call me.

Very truly yours,

LAZZARO LAW FIRM, P.C.

BY: _____
JAMES KIRSHNER

cc.:    AUSA Michael Warren
        via fax: (718) 254 – 6478

        USPO Frank Marcigliano
        via fax: (347) 534 – 3747

Beys, Stein & Mobargha LLP

Nader Mobargha

October 5, 2012

**TO BE FILED UNDER SEAL**

**BY FACIMILE (718) 613-2236 AND BY MAIL**
The Honorable Brian M. Cogan
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    **12 MC 557 (BMC)**
> **Doe's Reply to Wilson Elser's Opposition**
> **to Doe's Civil Contempt motion**

Dear Judge Cogan:

On behalf of John Doe ("Doe"), we respectfully submit this reply letter in response to Wilson Elser Moskowitz Edelman & Dicker LLP's ("Wilson Elser") letter, dated September 5, 2012, on behalf of Richard Lerner ("Lerner"), in opposition to Doe's civil contempt motion and the various supplements to it ("September 5th Letter"). In the September 5th Letter, Wilson Elser fails to deny – or even address – most of the allegations in our civil contempt motion. Worse yet, Wilson Elser has elevated their contemptuous activity to another level by submitting a false, possibly perjurious, affidavit from Brian Vodicka ("Vodicka"), which is attached to the September 5th Letter.

**I-     Wilson Elser fails to deny – or even address – most of the allegations in Doe's civil contempt motion**

> **A.     *Wilson Elser continues to ignore the Court's prohibition on Roe and Lerner's use of their tainted, inside knowledge of sealed information to give new life to public information in violation of the Court of Appeals' injunction***

Wilson Elser shows either a profound lack of knowledge about the record in this case, or the willingness to turn a blind eye to the numerous allegations concerning Richard Roe ("Roe")

The Chrysler Building
405 Lexington Avenue
7th Floor
New York, New York 10174
646-755-3603 (Direct)
646-755-3599 (Fax)
nmobargha@beysstein.com

and Lerner's dissemination of stolen, sealed documents to third parties and their pattern of using their tainted, inside knowledge of sealed information to piece together a puzzle for reporters and third parties. This Court presciently expressed its concern over this latter strategy almost a year and half ago:

> That's what I am concerned about the tone and nature of Mr. Lerner's paper, that [he] will take one small reference, combine it with other things you know from documents that were not in the public domain and give that public domain statement of a minor nature a whole new life *and that [he] will not be permitted to do.*

(*See* Transcript of April 1, 2011 before this Court ("April 1st Transcript"), at 8:23 – 9:3 (emphasis added); *see also* May 13, 2011 Order ("May 13th Order"), at 2 ("[E]xtrapolation from sealed documents will not be permitted because it could easily be combined with and thereby tainted by Roe's knowledge of non-public, sealed information.")). Indeed, considering Roe and Lerners' unique position of being privy to sealed documents that Roe stole, they should not have *any* contact with the press. However, rather than follow this Court's mandate – as outlined at the April 1st Hearing and in May 13th Order – Roe and Lerner have done the opposite. They have created a media storm since the issuance of the Court of Appeals' injunction and have given a "whole new life" to Doe's sealed case. (*See* May 13th Order, at 9:2-3). The contents of the articles also show that Roe and Lerner disclosed sealed information to the reporters, or at the very least, with a wink and a nod, led the reporters to "discover" the sealed information – precisely what this Court unambiguously prohibited them from doing. (*See supra* April 1st Hearing & May 13th Order).

### B. *Wilson Elser ignores their multiple illegal public submissions in the face of court orders*

Wilson Elser also fails to address – or even acknowledge – Roe and Lerner's multiple *undisputed* violations of court orders whereby they publicly filed letters and briefs with the United States Supreme Court, the Court of Appeals, and the District Court, in the face of unambiguous court orders prohibiting them from doing so. (*See, e.g.,* Doe's March 23, 2011 letter (cataloguing all the undisputed violations of court orders prior to February 14, 2011); Doe's September 7, 2012 letter)(discussing Wilson Elser's public filing of their Supreme Court brief in blatant violation of the Court of Appeals' injunction). That is because Roe, Lerner, and Wilson Elser do not believe the rules apply to them.

### C. *Wilson Elser does not deny any of the allegations in our contempt motion*

Remarkably, neither Roe nor Lerner – nor Wilson Elser in their September 5th Letter - denies any of the allegations in our civil contempt motion.[1] That is because they cannot. Rather

---

[1] Rather than catalogue every contemptuous act committed by Lerner and Roe during the last two years, we will let the record speak for itself.

than deny the allegations in the record, Roe and Lerner have stated their intention to "assert the Fifth Amendment, whether this be civil or criminal...in which case there [will be no] testimony from either of [them]." (*See* Transcript of February 27, 2012 Hearing before this Court, at 3:24-4:3). While a negative inference cannot be drawn when one pleads the Fifth Amendment in a criminal proceeding, the opposite is true in a civil proceeding. In a civil proceeding such as this one, such an adverse inference can be drawn. Consequently, Roe and Lerner's refusal to address or deny our allegations could give rise to an adverse inference, which may serve as a predicate for liability in this civil contempt proceeding.

### D. *Wilson Elser only focuses on two disclosures, one of which is irrelevant, and continues to support the unsupportable position that it can violate sealing orders that it believes are invalid*

In addition to refusing to address or deny our allegations, Wilson Elser misrepresents our position and pretends that the entirety of our civil contempt motions centers only around two disclosures: Doe's conviction as outlined in the government's March 2, 2000 press release and the disclosure of an April 29, 2002 letter in the docket of *U.S. v. Lauria* (the "Lauria Letter"), 98 CR 1102 (ILG).[2]

First, we never alleged that the dissemination of the March 2, 2000 press release disclosing Doe's conviction was unlawful. Consequently, it is puzzling why Wilson Elser spends so much time in the September 5th Letter discussing this disclosure.

Second, Wilson Elser's casual dismissal of Roe and Lerner's disclosure of the Lauria Letter shows a contempt for court orders similar to that which its clients, Roe and Lerner, have shown during the past two years. Wilson Elser admits that the Lauria Letter may have been resealed, but claims that "resealing does not bar dissemination."[3] (*See* September 5th Letter, at

---

[2] In their September 5th Letter, Wilson Elser also claims that the Newsweek/Daily Beast article, entitled, "Inside Donald Trump's Empire: Why He Won't Run for President," which referred to a 2009 civil complaint, is in fact referring to the "2009 complaint filed in Delaware...not the complaint in the 10-cv-3959 action." Wilson Elser also claims that the "article identifies its sources" as they are "hyperlinked in the on-line article." (*See* September 5th Letter, at 4). First, Wilson Elser has no basis for making this claim simply based on the date of the complaint. Roe drafted 72 versions of the illegal complaint that started all of this litigation, and one of the versions could have been dated 2009. Second, curiously, despite providing links to most of his sources, Mr. Wayne Barrett, the author of the article, does not provide a link to this specific source. This should at least arouse some suspicion that the source, the 2009 complaint, may contain the stolen, sealed information that has given rise to this flood of litigation. In short, without denying that Roe and Lerner gave a reporter a complaint containing and attaching stolen, sealed information, Wilson Elser hopes that the Court will just give Roe, Lerner and Wilson Elser the benefit of the doubt after two and half years of deceptive litigation practices and illegal conduct.

[3] Wilson Elser claims that the letter is available at the National Archives. As we stated in our March 23, 2012 letter, we contacted the National Archives chapter in New York City and spoke with the custodian

Page 5 of 7

Wilson Elser attached to its September 5th Letter, is misleading, and possibly perjurious, omitting crucial facts that would render the purpose of its submission – that Vodicka is a disinterested third party with no ties to Roe – meaningless.[4]

Far from being a disinterested party who happened to "discover" Doe's sealed information and connect the dots between the public information concerning Doe and the various sealed proceedings - all by himself - Vodicka is a pawn of Roe, much like Lerner has been over the past two years. Vodicka's affidavit discusses how the Sky Development Group (the "Sky Group"), particularly the Sky Group of Texas, was "the largest mortgage, banking, money laundering, bankruptcy, and tax frauds in Austin's (Texas) history." (*See* Vodicka Affidavit ("Vodicka Aff."), at ¶ 17). In his affidavit, Vodicka also states that Eugene Borokhovich was a "control person" in the Sky Group fraud. (*Id.*, at ¶ 23). However, a simple Google search of Vodicka's and Roe's names would have shown that *Roe was Borokhovich's lawyer in connection with the Sky Group fraud.* (*See* Ex. 3, Credit.net, "A classic Florida swindle, with a Russian twist," dated February 5, 2012, at 3). In fact, Roe was also Borokhovich's business partner in the Sky Group and pitched investors in Texas, where Vodicka claims many investors, including himself, were swindled. In addition, as part of his work on the Sky Group, Roe prepared a tax shelter for Borokhovich as a means for him to avoid paying taxes on any Sky Group profits. Consequently, aside from the fact that Roe himself was involved in the very fraud that Vodicka claims to be a victim of, it is highly likely that Vodicka and Roe know each other and that Roe fed Vodicka information about both the Sky Group and Doe.[5]

**III- Wilson Elser failed to conduct a simple conflicts check before representing Roe, which would have shown that Roe had extorted one of their own clients in a litigation**

Wilson Elser's failure to investigate basic facts behind the Vodicka affidavit is not surprising. Indeed, it appears that Wilson Elser failed to conduct a simple conflicts check when they agreed to represent Roe over two years ago. Had they done so they would have discovered that he was an adverse party in a litigation against one of Wilson Elser's former clients, Tony Regan, a real estate developer. They would have also discovered that, in that litigation, Roe *had employed the same litigation tactics that he has been using against Doe, namely, extortion.* Specifically, Roe was Regan's former lawyer who tried to extort Regan, his client, out of $5 million, frivolously claiming that Regan had promised him an equity percentage in one of

---

[4] For the sake of brevity, we will not address every single perjurious allegation in the affidavit, but rather will focus on the ones that are relevant for the purposes of this letter.

[5] This would not be the first time Roe and Lerner used a shill to perform acts that they are prohibited from doing themselves. Upon information and belief, in the motion to unseal the docket (12 MC 00150), which is currently before Judge Glasser, Lerner's wife, Linda Strauss, was one of the "members of the public" who moved to unseal the docket.

Regan's real estate development projects. Of course, there was no writing reflecting such an agreement between Roe, the lawyer, and Regan, his client. That did not matter. In or around December 2005, half-way through a separate real estate project of Regan's, Roe sued Regan in California and filed a *lis pendens* on the project, holding it hostage to his frivolous claim. As Regan's lawyer, Roe knew that Regan could lose millions of dollars if the real estate project did not proceed. Roe also knew that a lawsuit, no matter how frivolous, would seriously delay and disrupt the project. Ultimately, nine months late with the *lis pendens* costing the project millions of dollars, Regan was forced to give into Roe's extortionate claims and paid him $500,000 as a settlement.

As Regan's lawyer in his litigation against Roe, Wilson Elser was a first-hand witness to Roe's frivolous use of the judicial system and his extortionate tactics. However, rather than try to distance themselves from Roe when he subsequently came to them for legal representation in this case, *they agreed to represent him in the same type of extortion campaign that Roe had subjected their client to a few years earlier.*

In sum, Wilson Elser's opposition to our motion for civil contempt is symptomatic of how, as a firm, they have handled themselves throughout the last two years. They fail to investigate basic facts about their clients; they fail to conduct simple conflicts checks to determine what kind of adversary their new client is; they fail to follow court orders, casually dismissing them as unlawful; and they ignore their role in an extortion campaign that has placed John Doe – a man, who regardless of his criminal past, has risked his life on matters of national security, thwarted terrorist attacks and saved countless lives in the process – and his family in great danger. This national law firm should be held liable for this disgraceful pattern of conduct during the last two years.

Respectfully Submitted,

Nader Mobargha
Beys, Stein & Mobargha LLP
*Counsel for John Doe*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------x
UNITED STATES OF AMERICA,

            Plaintiff,

    -against-

JOHN DOE,

            Defendant.
--------------------------------------------x

FILED UNDER SEAL

SCHEDULING ORDER
98 CR 1101 (ILG)

GLASSER, United States District Judge:

On February 4th, 2011, Richard Roe, by his counsel, "demanded" that the Court "immediately docket all events that have occurred in this case from its inception."

In a letter dated March 17th, 2011, the government responded.

In this letter, the government presented its analysis of the public's right of access to judicial proceedings pursuant to principles of Common law and as may be required pursuant to the First Amendment. In a separate letter, the government briefly summarized every docket entry and stated its position as to whether the entry should remain sealed, be partially unsealed or entirely unsealed.

The Court did not respond to Richard Roe's demand when it was made and defers acting further on both submissions given a question as to its continuing jurisdiction.

On May 18th, 2010, this Court issued an Order (TRO) temporarily restraining Richard Roe and others from disseminating Sealed and Confidential materials pertaining to the above captioned case.

That TRO was extended until June 21, 2010 when, in proceedings on that day, Richard Roe was ordered to return certain sealed documents to the United States Attorney's Office.

On July 9th, 2010, Richard Roe filed a Notice of Appeal from "that aspect of the

May 28, 2010 TRO (including all of the subsequent versions, extensions and renewals of

this order) issued by the Honorable District Judge Israel Leo Glasser, which — by

operation of law – may have converted to a preliminary injunction on or after the

hearings which were held on June 11, 14, and 21, 2010." In the Notice he also appealed

from the permanent injunction issued on June 21, 2010.

On August 9, 2010, Richard Roe filed another Notice of Appeal from a TRO

directed to him, issued on July 20, 2010.

Following a hearing of those appeals on February 14, 2011, the Court of Appeals,

in a Summary Order issued that day, Docket No. 10-2905-cr, directed in relevant part:

> Pending a full review of the merits of Roe's appeal by a panel
>
> of this Court, the government, by a sealed motion of January
>
> 26, 2010 and accompanying affidavits, requests a temporary
>
> stay of the unsealing of Docket No. 10-2905-cr and of the
>
> materials placed under seal by Judge Glasser pending the
>
> appeal of this matter. In light of the serious, indeed grave,
>
> concern expressed by the United States regarding the
>
> possible consequences of unsealing these documents, and in
>
> the absence of any sufficiently persuasive countervailing
>
> considerations expressed by Roe, the government's motion is
>
> hereby GRANTED. (emphasis mine),

It is Hornbook law that the filing of a notice of appeals confers jurisdiction on the

Court of Appeals and divests the district court of its control over those aspects of the

2

case involved in the appeal. <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982).

I note at the outset that read literally, Richard Roe's demand letter of February 4th, 2011, if regarded as a motion, is not a motion to unseal anything. Rather, it is a motion that matters be docketed.

In <u>Cabell v. Markham</u>, 148 F.2d 737, 739 (2d Cir. 1945), Judge Learned Hand wrote "'It is not an adequate discharge of duty for courts to say: We see what you are driving at but you have not said it, and therefore we shall go on as before,'" quoting from <u>Johnson v. United States</u>, 163 F. 30, 32 (Holmes, J.). He then went on to write the oft-quoted words: "But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." The teachings of those Masers leads me to regard the demand to docket as one to unseal which is what I "see that he is driving at."

My circumspect uncertainty concerning my jurisdiction to address the issue presented in the letters alluded to is based upon the following. My orders enjoining Roe to do and refrain from doing what was proscribed was a judicial response to his publication of sensitive, confidential information contained in court files, the docket of which was plainly marked "Sealed Case." All filings in that case were thereafter sealed whether or not any given documents also bore the legend "Filed Under Seal."

In addition, his unilateral determination of entitlement to disclose that information, given the context in which it was disclosed – a complaint filed by Roe in a civil action in the Southern District of New York – made it far from certain whether the disclosure was made exclusively for his own benefit rather than to vindicate a right of

3

public access.

Neither a case nor a filed document can be sealed without a court order, United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995); R&G Mortgage Corp. v. Federal Hme Loan Mortgage Corp, 584 F.3d 1, 12 (1ˢᵗ Cir. 2009), and it must be presumed, therefore, that such an Order existed, explicitly or implicitly. In unilaterally deciding that such an order did not exist, or, it if did exist, it was binding on court personnel only; or in any event, he had a First Amendment right to publish that which was sealed, he knowingly and intentionally flouted a Court order. It is a fundamental principle that court orders carry an initial presumption of validity and must be obeyed even if it is later shown to be erroneous. McDonald v. Head Crim. Ct. Superior Officer, 850 F.2d 121, 124 (2d Cir. 1988). If a person believes an order to be erroneous, he must establish that through established procedures and not by unilaterally deciding that it can be ignored. Manness v. Meyers, 419 U.S. 449, 458 ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person . . . believes that order is incorrect, the remedy is to appeal, but absent any stay, he must comply with the order.") The procedure that Roe was required to have followed, given any one of his assumptions, was to move the Court for an Order unsealing the document providing the reasons and the authority for granting the relief sought.

The injunctions issued by the Court were deemed compelled by Roe's ignoring of the sealing directives; the danger to the life of John Doe by publishing the sealed matter and for his possession of and threatened publication of information in a presentence report which is not a Court document In re Siler, 571 F.3d 604, 610 (6ᵗʰ Cir. 2009); United States v. Corbitt, 879 F.2d 224, 239 (7ᵗʰ Cir. 1989); United States v. McKnight,

4

771 F.2d 388, 391 (8th Cir. 1985), and the confidentiality of which is sedulously guarded. United States v. Charmer Industries, 711 F.2d 1164 (2d Cir. 1983).

Regarding Roe's demand letter of February 4th, 2011, as a motion to unseal "all events that have occurred in this case" and the government's motion requesting a "temporary stay of the unsealing of the materials placed under seal by Judge Glasser pending the appeal of this matter," which the Court of Appeals granted, it would appear that the issues of sealing and unsealing are the "aspects of the case involved in the appeal."

It is for those reasons that the Court is uncertain of its continuing jurisdiction to address the controversy presented by the letters referenced above. Accordingly, I request the government, Richard Roe and John Doe to brief the issue of the Court's jurisdiction and submit their briefs simultaneously on April 8th, 2011.

SO ORDERED.

Dated:     Brooklyn, New York
           March 23, 2011

I. Leo Glasser

5

# EXHIBIT 2

X12endoen                    SEALED

1   grievances by filing a complaint in an action --

2          JUDGE CHIN:  Do you acknowledge, right or wrong,

3   whether the sealing order was correctly issued or not correctly

4   issued, do you acknowledge that your client has to comply,

5   subject to his right to appeal?

6          MR. LERNER:  Your Honor, I am not certain which

7   sealing order you're referring to.

8          JUDGE CHIN:  Any order.  If there is an order in place

9   prohibiting him from disclosing certain things, do you

10  acknowledge that he must comply with that order subject to his

11  ability to appeal and get relief from a higher court?

12         MR. LERNER:  May I read directly from the transcript

13  below with respect to that issue?

14         JUDGE CHIN:  I would like it if you would answer my

15  question.

16         MR. LERNER:  The answer to the question was answered

17  on the record by Mr. Roe.  He said, My understanding is that a

18  sealing order is directed to court personnel and it is not an

19  in personam -- it is not an order against other individuals.

20         JUDGE CABRANES:  Judge Chin directed his question to

21  you.

22         MR. LERNER:  My answer is no, a sealing order is

23  directed to court personnel.  It is not directed to

24  individuals.  A sealing order may be accompanied by an

25  injunctive order prohibiting speech.

1          JUDGE CHIN:  What is the point of a sealing order if a
2     party could freely disseminate the document?  It would
3     completely undermine the point of the sealing order.

4          MR. LERNER:  Judge Glasser stated on the record that
5     there is no sealing order in the case, so he could not have
6     violated a sealing order.  Moreover, in the testimony, Mr. Roe
7     stated, My understanding is that a sealing order is not an
8     injunction, and he cited in his testimony a case called Roman
9     Catholic Diocese, a Kentucky case, the Supreme Court.  And
10    Judge Glasser stated, Your understanding is correct.

11         JUDGE CABRANES:  When Roe obtained these documents,
12    were any of them marked in any way that suggested that they
13    were under seal?

14         MR. LERNER:  Not the criminal information, not the
15    complaint, not the cooperation agreement.  There were markings
16    on the PSR.  I don't recall the exact language of the PSR, but
17    it is not a 65(d) injunction, which must be directed to
18    specific individuals.  It must state the basis for the
19    injunction.  It is not a court order directed to
20    Mr. Oberland -- Mr. Roe.

21         JUDGE CABRANES:  You can refer to him by name here.
22    It's all right.  We are all under seal here.  But, of course,
23    you may not believe in sealing orders.  But you can feel free
24    to refer to anyone here by the correct name or the code name,
25    as you wish.

# EXHIBIT 3

Print 📄    Close 🗙

(infogroup Credit.net

## A classic Florida swindle, with a Russian twist
**Miami Herald (FL) Sunday February/05/2012**

Feb. 05--When North Miami Beach developers Victor and Natalia Wolf hosted a baby shower on a luxury yacht to celebrate their first child, they had just reaped millions flipping a huge tract of land on Florida'sGulf Coast during the historic housing boom.

Complete with flaming desserts and Vodka ice sculptures , the dinner cruise on the Intracoastal was attended by more than 100 guests as the Wolfs unveiled their next project: an ambitious $150 million development.

Now, five years after the couple vanished in the night -- with millions belonging to their clients -- investors are hoping to uncover details of the financial labyrinth concocted by the couple from the lone person who worked with them: their lawyer.

A civil trial later this year against a Hollywood attorney for the Wolfs could provide more information about the fugitives suspected of being part of a criminal enterprise of Russian nationals and preying on investors during the most explosive economy in Florida history.

Indicted last year on federal fraud charges in Miami, the Wolfs are accused of fleecing 400 people -- including retirees, veterans and Russian immigrants -- in a case expected to reach $100 million in losses.

"They stole, robbed. They reduced people to bankruptcy," said Alexandra Krot, an oncologist who said she was bilked of $4 million. "They were major scammers."

The couple left a trail across Florida and Texas -- including two unfinished housing projects -- before bolting from their ransacked waterfront house in North Miami Beach in late 2006 and fleeing to Germany. In their offices: busted computers with hard drives ripped out.

Though Florida regulators found the Wolfs were breaking state land laws in 2005, it wasn't until two years later the state moved to shut them down. By then, the Wolfs had long disappeared.

Just this month, investors have been petitioning the federal marshal's office in Miami to post the couple's photos on the national fugitive website.

The attorney who advised them on their land deals, Benjamin Schulman, has so far refused to testify in lawsuits on the advice of his lawyer. But now, he may reveal what he knows in a civil trial in Broward circuit court in August, said his attorney, Richard Sharpstein.

"He had no idea they were disgusting, despicable thieves," said Sharpstein, whose client was not criminally charged.

The case of the Russian couple represents one of the most complex frauds carried out in Florida during the land frenzy, with investors left to untangle rights to dozens of properties-- and investigators searching for millions in a maze of bank accounts.

The FBI organized crime office in Fort Lauderdale refused to talk about the case, saying it's still an ongoing investigation.

During a conference in Moscow on organized crime, the FBI sought help from Russia'sInterior Ministry in tracking the Wolfs, who used credit cards to buy expensive jewelry before fleeing, according to sources.

Over the past five years, courts in Florida and Texas have been settling 54 property suits and other disputes over who's to blame for failing to detect the massive fraud.

With just sketchy details, investors say they're still baffled by the couple who wore Hermes clothes, drove a

luxury Maybach and threw parties at their beachfront condo in Sunny Isles Beach.

"I am a pretty good judge of character," said burned investor Peter Madison of Orlando. "But I can tell you these people surprised me. They were super nice."

One of the Wolf deals -- a 100-acre peanut farm in the Panhandle -- was sold to three different people who held deeds to the farm at the same time. "They'd bring people in here on helicopters," said Madison, who owned the first mortgage.

The Wolfs sudden rise during the housing boom began inauspiciously with Natalia Wolf . flunking the state mortgage brokers' exam in 2002.

But in two years, she and her husband opened an office in a strip center in North Miami Beach with the names Sky Development Group LLC and Sky Construction.

Instead of targeting land in South Florida, the couple took aim at a quiet corner of Florida's west coast 300 miles away -- Citrus County -- to make their stand.

They joined the chamber of commerce. They sponsored a booth at a home show. They opened a sales office, passing out splashy brochures.

"They were giving out hot dogs and had buses going back and forth," recalled Fort Lauderdale businessman Peter Mazzarino, who put down $28,500 for the Wolf's company to build a new home.

The couple went on a blitz over the radio and Internet to recruit buyers, promising to make Citrus County one of the next major destinations of Florida.

In two years, 368 investors from 22 states and five countries stepped up to snare property while prices were exploding. Lots once costing $2,500 were now selling for $25,000 and higher in the rural area. "The boom was there. You had to buy immediately," said Krot, 70, who formed a partnership with the Wolfs. "Otherwise someone else would buy it."

State regulators with the Department of Business and Professional Regulation launched an investigation in 2005, finding Sky Development failed to register with the state, demanding the company offer refunds to buyers.

After first accepting the terms to avoid a $3.2 million fine, the Wolfs ignored the order and continued selling land -- while the state never enforced its own order.

During the ordeal, the Wolfs even took in a new partner, Aaron Miller, 37, an Orlando man with a long rap sheet -- including worthless checks, cocaine possession, burglary and fraud convictions -- to help sell land while the market was hot.

Meanwhile, the Wolfs were hosting cocktail parties and dinners, including their own baby shower on a yacht in 2006. "It was one of the fanciest parties I have ever been to," recalled Madison, 54, who said he was won over by the couple's charm.

Hollywood resident Robert Alley and his wife forked over $189,700 for three lots after meeting the Wolfs in early 2006 and then bought more for $300,000. Vsevolod Dounaevslo of Pennsylvania gave $143,224 to the Wolfs as a down payment to build a dream home and pool.

Others did the same. "They were personable," recalled Madison. "They'd call me on my birthday. They'd buy me gifts for Christmas."

At first, Krot said she made money with the couple as they bought and sold land -- once flipping 500 lots and reaping a $4.7 million profit on paper after owning the land just two weeks in 2005. But as the market began to slow in Florida, the Wolfs looked elsewhere to keep their scheme going: Texas.

There, Victor Wolf formed a company -- Sky Group of Texas LLC -- unveiling one of the largest housing and retail projects ever proposed for suburban Austin. "It was supposed to be the poster child of developments for the 21st century," said Brian Vodicka, a retired adjunct business professor at the University of Texas who invested $915,000 with his partner.

Using stationary with a bogus Aventura address, the company began pushing the plan, which included a Nieman Marcus, Cartier, Gucci and Saks Fifth Avenue.

Meanwhile, two other partners, Vitaly Zaretsky and Eugene Borokhovich, took leadership roles in the project, even hiring the mayor of the town of Manor to recruit investors.

But while the project was unfolding, the Wolfs were getting in trouble in Florida: Investors found phony deeds and fake mortgage documents, police records state.

..... ..... ..... found out the $1 million one found the Wolfs was secured with land they didn't own. Nelson Cruz discovered the Wolfs walked away from a strip center they agreed to build, and worse, spent his entire $25,000 down payment.

Mazzarino and others began calling the couple and sending emails, demanding their money back.

Natalia Wolf, 37, finally turned over a $28,500 check to Mazzarino, but when he took it to the bank, he was told it was worthless.

After Mazzarino alerted North Miami Beach police, a detective drove to the Wolf home and found the house ransacked and the couple and their infant daughter gone. "It was like in the middle of the night — just gone," said Mazzarino.

Federal agents later discovered that Natalia Wolf, armed with a German passport, boarded a flight with her daughter in Miami, stopped in New York, and then flew to Germany. Victor Wolf, 53, was a tougher target, with no trace in the first few days.

In the ensuing months, dozens of victims came forward to say they were scammed by the couple, filing 44 lawsuits in Citrus County. Sheriff's deputies found at least 256 bogus warranty deeds -- dozens with forged signatures and fake notary seals.

Mazzarino said he recalls talking to the wife of a U.S. serviceman in Iraq. "They had invested all their savings. She's crying and the babies are crying in the background," he said. "Her husband was in a war zone and he didn't need to hear that...these people destroyed lives."

In Texas, the fallout was just as grim: 31 investors, three banks and three other lenders clamoring for $53 million invested in land covered by vast barren tracts — not one building.

"It was a disaster," said Vodicka.

In a court deposition, Zaretsky said he didn't know Wolf's whereabouts, and Barokhovich was never questioned. Burned investors have accused the partners in three civil cases of widespread fraud

Barokhovich's lawyer said the project was built on inflated land values and sham sales carried out by Zaretsky. "[He] pulled off a trifecta of fraud," said attorney Fred Oberlander in a court motion.

Zaretsky, who is living in New Jersey, could not be reached. But his lawyer, Winston Krause, said the land deals were all supervised by a title company to ensure they were proper.

In November, state regulators moved to shut down the title company -- North American Title Company in Texas -- accusing the firm of carrying out "false and misleading" settlements in the deals.

Ben Schulman, the Broward lawyer suspended from practice for his role as the Wolf's lawyer in the Florida deals, could reveal more about the couple in the upcoming trial. But his lawyer insists he knows nothing about their whereabouts.

"He met with the federal authorities and told them everything," said Sharpstein. "Ben turned over every single signed piece of paper he had to the federal government."

Jay Gayoso, an Aventura lawyer suing Schulman in the Broward case, said questions abound over deals in which Schulman played a direct role.

In 2006, the Wolfs promised to turn property over to an investor as security for a $1.65 million loan, but there was one problem: The Wolfs had already peddled a big piece of the land to someone in Trinidad. "They were simultaneously using the same property," said Gayoso.

Other questions have been raised about the paper trail left by the couple -- the whereabouts of millions of dollars taken in by the Wolfs while running Sky Development.

One employee who led their sales team in Citrus County, Robert Linton, said he quit his job after he discovered Sky was engaging in what appeared to be money laundering: The company would make large deposits -- more than $40 million -- followed by immediate withdrawals of the same amount, according to sheriff's reports.

The FBI is not talking in the case, but three investors said they were told during interviews with law enforcement agents that the Wolfs were networking with other Russian nationals in Florida and elsewhere.

In fact, law enforcement agencies suspect the Wolfs were not even using their real names, according to Citrus County sheriff's reports. Miller, a director in two companies with Natalia Wolf, could not be reached for comment. He was not charged.

Five years after the Wolfs fled, investors are suing the couple over their $2.4 million home, saying Natalia Wolf broke state law when she transferred ownership of the home five months before fleeing to a company known as G & G Property Investments, whose president is Oleg Firer. G & G later deeded the house to Firer, who did not return phone calls seeking comment..

Today, hundreds of acres scattered across Citrus County remain vestiges of the Wolf's project: weedy, barren lots where homes were promised in color brochures. The sales office is boarded up and the billboard ads long removed.

Gayoso said the Wolfs created what he calls, "The perfect storm: land that was located in undeveloped, rural areas. You had home prices that were doubling, tripling and the Wolfs were looking to exploit people who were looking for the next great hit," he said. "There have always been the stories about Florida swampland. This is the modern equivalent."

Chanelle Garzon, Elizabeth Clarke, Jose Triana and Sam Puran contributed to this report.

----

(c)2012 The Miami Herald

Visit The Miami Herald at www.miamiherald.com

Distributed by MCT Information Services

®Copyright 2012 AMX. Published by OneSource Information Services, Inc., February 2012

Credit reports are available on 15 million U.S. and Canadian businesses from Credit.net. Use them for business verification, qualifying prospects, finding information, and making low-risk, low-dollar credit decisions. For more information, call 888-249-5015 or visit www.credit.net.

Print 🖶    Close 🔲